## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

RACHEL POTTER,
    *Plaintiff*,

*v.*                    CASE NO. 13-CV-11998

COMMISSIONER OF         DISTRICT JUDGE MATTHEW F. LEITMAN
SOCIAL SECURITY,        MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

This Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (docket 10)
be denied, that Defendant's Motion for Summary Judgment (doc. 11) be granted, and the decision
of the Commissioner be **AFFIRMED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of
Reference, this case was referred to this magistrate judge for the purpose of reviewing the
Commissioner's decision denying Plaintiff's claim for a period of disability and disability
insurance benefits (DIB), and supplemental security income benefits (SSI). The matter is currently
before this Court on cross-motions for summary judgment.[2] (Docs. 10, 11.)

---

[1]The format and style of this Report and Recommendation comply with the requirements of Fed. R. Civ. P.
5.2(c)(2)(B). This Report and Recommendation only addresses the matters at issue in this case and is not intended
for publication in an official reporter or to serve as precedent.

[2]The Court has reviewed the pleadings and dispenses with a hearing pursuant to Eastern District of Michigan
Local Rule 7.1(f)(2).

Plaintiff filed an application for a period of disability, DIB and SSI on July 12, 2006, alleging that she became unable to work on July 31, 2002. (Transcript, Docs. 7 at 152.) In an administrative law judge (ALJ) decision dated May 8, 2009, Plaintiff was determined to have been disabled as of October 10, 2006. (Tr. 147-60.)   The Appeals Council remanded the case on November 2, 2009, to the same ALJ for a determination of disability for the period from July 31, 2002, through October 9, 2006, with directions that the October 10, 2006 disability onset date not be disturbed. (Tr. 161-64.) The ALJ issued a second decision dated September 23, 2010, and found that Plaintiff was not disabled until August 9, 2007, thus disrupting the prior October 10, 2006 onset date. (Tr. 165-86.) The Appeals Council remanded the case again, with orders to consider Plaintiff's Residual Functional Capacity (RFC) and ordering that the case be assigned to a different judge. (Tr. 187-91.)

On May 7, 2012, Plaintiff appeared at a hearing before Administrative Law Judge Anthony Smereka, who considered the Plaintiff's claims pursuant to the Appeals Council Order dated August 26, 2011. (Tr. 187-91.) In a decision dated May 24, 2012, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act at any time from July 31, 2002, through October 9, 2006, one day prior to the onset date of disability. (Tr. at 39.) Plaintiff requested Appeals Council review of this decision. (Tr. 22.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on March 7, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. 6-11.) On May 6, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.     Standard of Review**

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is "more than a scintilla . . . but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports another conclusion. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)(citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc)(citations omitted)).

3

"Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party")(citations omitted); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

### C.    Governing Law

Disability for purposes of DIB and SSI is defined as the:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a)(DIB), 416.905(a)(SSI).

Plaintiff's Social Security disability determination is to be made through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003)(cited with approval in *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 540 (6th Cir. 2007)); *see also Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)("[c]laimant bears the burden of proving his entitlement to benefits."). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. § 416.920(a)(4)(v), (g)); *see also* 20 C.F.R. § 404.1520(a)(4)(v), (g).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through March 31, 2006, and had not engaged in substantial gainful activity since July 31, 2002, the alleged onset date. (Tr. 32.)

At step two, the ALJ found that Plaintiff's cerebral palsy, urinary retention and urgency, asthma, obesity and depression were "severe" within the meaning of the second sequential step. (Tr. 32.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. 32-34.) The ALJ found that for the period of July 31, 2002, through October 9, 2006, Plaintiff had the residual functional capacity (RFC) to perform sedentary work as defined in the Regulations[3] with the following additional limitations:

> [C]laimant was restricted from working at unprotected heights, including no climbing of ladders, ropes or scaffolds; was restricted to no more than occasionally climbing of (sic) ramps or stairs; could occasionally balance, stoop, knell (sic) and crouch but was restricted from any crawling; could not perform work requiring the use of foot controls including any driving; was restricted from hazards such as sharp objects; was restricted from work requiring any concentrated exposure to fumes, odors, dust, gasses or temperature extremes; and she was restricted to unskilled work. As of October 10, 2006, the claimant could not perform even a restricted range of competitive work, pursuant to the Order of Remand. (Tr. 34.)

At step four, the ALJ found that Plaintiff did not have any past relevant work because she had not worked at substantial gainful activity levels. (Tr. 37.) At step five, the ALJ found that Plaintiff could perform jobs existing in significant numbers in the national economy and therefore she was not suffering from a disability under the Social Security Act at any time from July 31, 2002 through October 10, 2006. (Tr. 39.)

### E.    Administrative Record

Plaintiff was 27 years old at the time of the most recent ALJ decision. (Tr. 37, 46-82.) Plaintiff has a high school education and had some special education classes in highschool. (Tr. 38, 51.) Plaintiff testified that she is able to read and write and she attended one semester of

---

[3]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. §§ 404.1567(a), 416.967(a).

college. (Tr. 51, 52.) Plaintiff testified that in 2006, her four children ranged in age from 20 months to 11 years old. (Tr. 62.)

Plaintiff reported that at her last job, which ended in July 2004, she worked as a cashier and in stock. (Tr. 403, 427.) She walked approximately one hour and stood five hours per 6-hour shift. (Tr. 427.) The heaviest weight lifted was less than 10 pounds. (Tr. 427, 447.) She reported that she was a lead worker and supervised about four people. (Tr. 428, 447.) She also completed an Adult Function Report dated August 31, 2006. (Tr. 435-42.) She reported that her back, legs and knee impairments affect all tasks that she tries to do. (Tr. 440.) At that time, she reported that she was able to walk 50 feet before needing to rest for five minutes to half-hour, depending on her leg cramps. (Tr. 440.) She reported that she used a walker daily, as needed, and a wheelchair for doing things outdoors. (Tr. 441.)

At the hearing Plaintiff testified that when she was working, she was falling on a daily basis. (Tr. 62.) She testified that she has had a wheelchair nearly her entire life and uses it as needed. (Tr. 64.) Plaintiff testified that in 2006, as at the time of the hearing, she was able to drive a car and continues to drive short distances, such as one mile to her children's schools. (Tr. 65.) Plaintiff described that in 2006 she was able to perform household chores, like folding the laundry, and her children would put the folded clothes away. (Tr. 66.) She was living in a townhouse at the time and could not use the stairs to go into the basement. (*Id.*) She testified that she stopped going downstairs to do the laundry in about 2004. (Tr. 66.) She testified that she has had migraines since highschool, and has approximately five to six per month, for which she has to go to bed. (Tr. 68-69.) She also described heavy menstrual cycles with pain and asthma for which she uses a nebulizer a couple of times per month. (Tr. 69, 71.) She testified that her incontinence became continuous in 2002 when she had her third daughter. (Tr. 72.)

Plaintiff has a history of cerebral palsy for which she has undergone multiple surgeries to address her gait. Her most recent surgery is documented in January 28, 2001 treatment notes that report Plaintiff had a "much improved" gait following a bilateral Strayer Procedure to lengthen the gastrocnemius tendons and fractional lengthening of the soleus muscles in 2000. (Tr. 585.) By the time of her follow-up examination, she had completed a course of physical therapy, was described as "pleased with the operation," her range of motion and ambulation were improved, and she continued to wear custom orthotics, yet walking was easier and strength was improving, though she still had occasional pain with deep bending or crouching. (Tr. 585.) Follow-up was advised in one year. (Tr. 585.) She sought emergency department treatment in June 2001 for complaints of a painful and swollen lip. (Tr. 600-04.) She sought emergency department treatment in April 2002 with complaints of lower abdominal pain. (Tr. 590.) She attended post-partum appointments in 2003. Additional medical evidence is discussed where relevant to the analysis below.

The vocational expert (VE) testified that Plaintiff's past jobs included a telephone information clerk that was really a "customer service clerk," semi-skilled with a Specific Vocational Preparation (SVP) level 3 and light in exertion, and cashier, also semi-skilled with an SVP 3 and light in exertion. (Tr. 76.) The ALJ clarified that due to Plaintiff's low level of earnings, her work is not classified as past relevant work. (Tr. 53, 76.)

The ALJ asked the VE to consider an individual able to perform light work, lifting no more than 20 pounds occasionally and 10 pounds more frequently with the following additional limitations:

> [S]tanding and walking to no more than two out of eight hours. . . . [N]o work at unprotected heights. That includes no climbing of any ladders, ropes, or scaffolds; no more than occasional climbing of ramps and stairs; can occasionally balance, stoop, kneel, and crouch; never any crawling; no operation of any foot controls; no driving; no hazards. That is such as work around sharp objects. In terms of environmental, no

concentrated exposure to fumes, odors, dusts, gases, as well as no temperature extremes, be it extreme heat or cold. And if we were to also impose unskilled work, would there be work that this person could perform; . . . ? (Tr. 77.)

The VE testified that such an individual could perform light exertional level assembly jobs, representative Dictionary of Occupational Titles (DOT) code 706.684-022, with approximately 3,500 jobs in Southeast Michigan and twice that number of jobs in the state of Michigan; packaging jobs with a DOT code 753.687-038, with 2,500 jobs in Southeast Michigan and twice as many statewide; and visual inspection jobs with a DOT code 727.687-054, with 1,800 jobs in Southeast Michigan and twice as many statewide. (Tr. 77-78.)

The ALJ then asked the VE to add an additional limitation to the prior hypothetical, by reducing the exertional level to sedentary weight, lifting no more than 10 pounds occasionally and less weight more frequently. (Tr. 78.) The VE testified that such an individual could perform assembly jobs, DOT code 713.687-018, with approximately 2,500 jobs in Southeast Michigan and twice that number statewide; packaging jobs, DOT code 559.687-014, with approximately 1,800 jobs in Southeast Michigan and twice as many statewide; and visual inspection jobs, DOT code 669.687-014, with approximately 1,500 jobs in Southeast Michigan and twice as many statewide. (Tr. 78.)

Next, the ALJ asked the VE to add the additional limitation "sitting throughout the day" with very minimal standing or walking. (Tr. 78-79.) The VE testified that the sedentary assembly jobs would be reduced to 2,000, the packaging jobs would be reduced to 1,500 and the inspection jobs would be reduced to 1,200, with the same DOT codes for all and approximately double the number of positions statewide. (Tr. 79.) He testified that these jobs could be performed with a sit-stand option, which he defined as being able to perform the job sitting or standing. (*Id.*) The VE opined that more than two absences per month would not be tolerated in competitive employment.

9

(Tr. 81.) Plaintiff's attorney confirmed that two absences per week would be work preclusive. (Tr. 81.)

**F.    Analysis**

Plaintiff frames the following issue on appeal: "The issue presented to this court is whether the Agency's conclusion that Plaintiff was not totally disabled from July 31, 2002 through October 9, 2006 where there is no medical evidence supporting such conclusion is clearly erroneous." (Doc. 10 at 5.) Plaintiff argues that the ALJ should have relied on the opinions of treating physicians James Eckner, M.D., and Jon M. Wardner, M.D., who opined that Plaintiff was disabled prior to the current October 10, 2006 onset date. (Doc. 10 at 8.) This case presents the complicated though not novel, issue of establishing an onset of disability well before the application date and with a scarcity of treatment notes or medical records for the time period at issue. Plaintiff specifically seeks to establish disability prior to her date last insured, March 31, 2006.

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson*, 378 F.3d at 544; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." SSR 96-2p; *see also Rogers*, 486 F.3d at 242.

Plaintiff argues that the ALJ should have given controlling weight to Dr. Eckner's April 7, 2008 opinion. (Tr. 696.) Dr. Eckner wrote the following:

> [Plaintiff] is a patient I saw once in my Physical Medicine & Rehabilitation clinic at the University of Michigan on December 20, 2006. She has spastic diplegic cerebral palsy, which is a non-progressive neurological condition caused by damage to the developing brain prior to or around the time of birth. In [Plaintiff's] case it causes weakness and spasticity in her legs with associated pain and mobility impairment. She has also been seen by one of my colleagues, Dr. Miles Colwell, in 1996 for the same diagnosis. Since Ms. Potter's neurological condition is static in nature and has been present since childhood, it would be reasonable to assume that her condition on December 20, 2006 was not significantly different from her condition prior to June 30, 2006. (Tr. 696.)

Plaintiff also argues that the ALJ should have given controlling weight to Dr. Jon Wardner's opinions, including a March 2011 form and a January 18, 2013 letter. (Tr. 840-41.) Dr. Wardner completed a Physical Medical Source Statement Form dated March 31, 2011. (Tr. 742-45.) Dr. Wardner listed diagnoses of cerebral palsy and asthma and reported that he had treated Plaintiff three to four times per year since 2007. (Tr. 742.) He noted that symptoms included spasticity and weakness of legs, noting that this was "as detailed in" an August 2007 three-page report. (*Id.*) He noted that she used a wheelchair and walker, could stand for five minutes at a time, could not walk a city block in length, but could sit for two hours at a time. (Tr. 743.) She could

11

only rarely lift or carry less than ten pounds, her legs should be elevated above the heart for 10 percent of an eight-hour workday, and she could be expected to be absent from work for three days per month as a result of her impairments or treatment, among other limitations. (Tr. 745.) He responded that the earliest date that the symptoms and limitations he described applied was "2004 or earlier." (Tr. 745.)

Dr. Wardner's 2013 letter, as well as Exhibit A to Plaintiff's brief, are documents that were not before the ALJ. Dr. Wardner's letter post-dates the ALJ's May 24, 2012 decision; it was submitted to the Appeals Council. "[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision. The district court can, however, remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996)(citing *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993)).

The "court is confined to review evidence that was available to the Secretary, and to determine whether the decision of the Secretary is supported by substantial evidence." *Wyatt v. Sec'y of Health and Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) (*citing Richardson*, 402 U.S. at 401). The court may still remand the case to the ALJ to consider this additional evidence but only upon a showing that the evidence is new and material and "that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). This is referred to as a "sentence six remand" under 42 U.S.C. § 405(g). *See Delgado v. Comm'r of Soc. Sec.*, 30 Fed. Appx. 542, 549 (6th Cir.

12

2002). The party seeking remand has the burden of showing that it is warranted. *See Sizemore v. Sec'y of Health and Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988). "In order for the claimant to satisfy this burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* (*citing Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)); *see also Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993) ("Where a party presents new evidence on appeal, this court can remand for further consideration of the evidence only where *the party seeking remand* shows that the new evidence is material.")(emphasis added)(citations omitted).

Plaintiff has not requested a sentence six remand and makes no argument that such remand is warranted. Nor does he show that the information is new or material. On the contrary, a review of Dr. Wardner's letter for the purpose of determining materiality shows that the letter does not set forth any additional information that was not already available to the current ALJ, including through Dr. Wardner's March 2011 opinion form. A review of the 2013 letter for purposes of determining materiality and whether the material was new reveals that it provides similar information to the 2011 form, including the reference that the work-preclusive limitations would have existed as early as 2004. Further, Plaintiff does not show good cause for the failure to present this evidence earlier. On the contrary, Plaintiff has had two other ALJ hearings, in 2009 and 2010, both post-dating the 2007 start of treatment with Dr. Wardner, at which she could have submitted such an opinion from Dr. Wardner. Similarly, with respect to those exhibits identified in the transcript as 16E through 18E and 32F and 33F, Plaintiff has failed to request remand and has not

provided any explanation for the failure to provide such documents prior to an ALJ hearing.[4] Many of the records were medical records pre-dating even the earliest of the ALJ hearings, and the statements from people who know Plaintiff were surely obtainable prior to any of the three ALJ hearings. These records are not new and material evidence warranting a sentence six remand.

Contrary to Plaintiff's assertion that the ALJ failed "to cite to any medical evidence of record that contradicts the opinions of Plaintiff's treating physicians that she was totally disable (sic) well before 2004," the ALJ relied on medical evidence of record which contradicted Dr. Eckner's and Dr. Wardner's opinions, was based on examinations that pre-dated Dr. Eckner's and Dr. Wardner's earliest examinations and opinions, and was closer in time to Plaintiff's date last insured and alleged onset date. (Doc. 10 at 9.) The ALJ also pointed out that Dr. Eckner did not

---

[4]    The additional records were reviewed for the sole purpose of determining whether they were new and/or material. In the 2013 letter, Dr. Wardner noted that despite having first examined Plaintiff in August 2007, he was qualified to comment on her condition prior to the first time he saw her, due to his professional and educational experience in physical medicine and rehabilitation, as well as his experience in electrodiagnostic medicine, neuromuscular disorders and spasticity management. (Tr. 840.) He opined that he was able "to state, with a reasonable degree of medical certainty, that [Plaintiff's] functional status would not have suddenly worsened in a period of a few months. The typical progression of functional problems is gradual." (Tr. 840.) He opined that her "ability to perform even sedentary work is limited by the need to elevate her legs, to help control swelling. She also develops tingling in the legs with prolonged sitting." (Tr. 840.) He noted that cerebral palsy is "generally a static condition, but patients can develop musculoskeletal and neurologic complications as the years go on." (Tr. 840.) He noted that Plaintiff's "leg muscles have become progressively spastic, requiring botulinum injections," she has "developed contractures of the ankles and persistent dependent edema of the distal lower extremities." (Tr. 840.) Finally, he opined that Plaintiff was "unable to work on a full-time, regular basis after December of 2004. Her condition is not reversible. I would suggest reviewing medical records from orthopedics and PM&R at UMHS, which I suspect will document her level of impairment, going back many years." (Tr. 840-41.)
       The record also includes treatment records for asthma exacerbations approximately once a year in 2002 and 2004, with complaints of neck and shoulder pain in 2003. These records do not show complaints related to Plaintiff's lower extremities or cerebral palsy. (Tr. 828-830.) A record from April 2004 shows complaints of urinary frequency and small amounts of incontinence. (Tr. 838.) Spasticity of both legs was noted, while noting that she "never had treatment for this" and recommending she return in 1 to 3 months for evaluation and to consider anti-spasmodic therapy at that time. (Tr. 838.) Treatment notes from March 2005 through July 2006 similarly relate to Plaintiff's cough, sinuses and/or asthma and do not establish treatment related to her cerebral palsy and lower extremity limitations. (Tr. 831-36.)
       Exhibit A to Plaintiff's brief is a summary of Plaintiff's treatment history with Board Family Chiropractic from April 22, 2005 through August 5, 2006 (Doc. 10 at 15-28.) Plaintiff was treated for neck and back pain. The records are not material. First, the summary entries are predominately the same for every treatment date. They also fail to establish the frequency of falls that Plaintiff alleges because the only reference to a fall are repeated entries noting care for shoulder pain related to a fall on February 26, 2005.

identify specific limitations associated with that time frame and Plaintiff's condition. (Tr. 35.) The ALJ reviewed the evidence of record and found that the evidence does not show the level of impairment prior to October 2006 that was suggested by Dr. Wardner and Dr. Eckner in their 2008 and 2011 opinions.

In *Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987), the treating physician reported that the plaintiff had significant limitations that would have resulted in a finding of disability, yet the doctor first saw the plaintiff "almost eight months after his insured status." *Id.* The court pointed out that the plaintiff suffered from more than one degenerative disorder and concluded that the doctor's report was "minimally probative" of the plaintiff's condition prior to the date last insured. *Id.* The court also noted that the opinions of two other doctors were rendered after initial consultations that post-dated the date last insured by more than eight months. *Id.* The court pointed out that "[n]either of those opinions can confirm a finding of disability during the relevant time period." *Id.*

Unlike *Siterlet*, where the court acknowledged a degenerative disorder, Dr. Eckner opined that Plaintiff's condition would have been static. The ALJ pointed out evidence of record that contradicted Dr. Eckner's assertion that Plaintiff's impairment is not progressive and the assumption that her condition on December 2006 would not have been "significantly different from her condition prior to June 30, 2006." (Tr. 696.) Evidence shows that Plaintiff herself reported increased pain and symptomotology, indicating a progression of limitations, even if not entirely attributable to the cerebral palsy. (Tr. 35-36, 612, 670, 679.) There is no evidence that Dr. Eckner or Dr. Wardner had the benefit of these other records on which the ALJ relied.

The ALJ relied on treatment records from as far back as February 11, 2003, when Plaintiff underwent a postpartum examination by Clark E. Nugent, M.D. (Tr. 35, 675.) Dr. Nugent noted

15

that Plaintiff had "mild" cerebral palsy and no difficulty ambulating, stating that Plaintiff "does have mild cerebral palsy and has some increased tone of her lower extremities. She ambulates without difficulty. She interacts very appropriately and shows no manifestation of postpartum depression." (35, 675.) On April 29, 2003, Steven Domino, M.D., conducted an annual examination and discussed Plaintiff's concerns about future pregnancies, including her desire to have another child within 18 months of her most recent child. (Tr. 673.) Dr. Domino's report focused primarily on timing issues for another pregnancy, yet on examination he noted her extremities were "without edema" and "lower extremities notable for less muscle mass when compared to the rest of her body" and had "numerous scars from her surgeries." (Tr. 673.) He noted a medical history "remarkable for cerebral palsy with majority of her symptoms in her lower extremities. She also has had asthma." (Tr. 673.) Plaintiff's concerns and treatment during that time related to a recent pregnancy and resultant baby, and planning for another child. There was no evidence of the extreme symptoms, including the limitations in ambulation and inability to maintain competitive employment, that were the basis of the finding of disability as of October 2006. The ALJ correctly noted that prior to December 2006, the "record is sparse and devoid of any regular complaints or ongoing treatments concerning cerebral palsy." (Tr. 35.)

On October 9, 2006, Plaintiff sought medical treatment due to a shoulder injury and reported that she had cerebral palsy since birth, with "spasticity in her lower muscles along with cramping and pain that have increased somewhat along with decrease in her motor skills in her lower extremity." (Tr. 679.) Plaintiff also reported urinary incontinence "really since her third child; worse after her fourth," and needing to use protection at that point. (*Id.*) In December 2006, Plaintiff reported "painful spasticity in her legs, especially at night." (Tr. 678.) It was noted that

16

Flexeril was "not really helping" and she "is now having pain with this." (Tr. 678.) She was referred to physical medicine and rehabilitation. (*Id.*)

A December 21, 2006 report by Miles O. Colwell, M.D., from the Physical Medicine and Rehabilitation clinic notes that Plaintiff had a history of spastic diplegic cerebral palsy that causes leg pain and mobility impairments. (Tr. 670-72.) The doctor noted,

> [Plaintiff] has been having increasing numbers (sic) and falls lately at home. She states that she usually catches her foot during the swing phase of gait leading to the falls. She states that she has been borrowing a walker as she states she feels more stable with it and has had less falls since beginning to use it. (Tr. 670.)

Dr. Colwell also noted that "[o]n review of systems, [Plaintiff] states that she does not have any difficulty controlling her bowel or bladder function." (Tr. 670.) Her gait was described as "slow and nonfluent" with a "flat foot strike" and at times she "catches her toes on the ground during the swing phase," yet the doctor noted that "she did not lose balance" while he observed her. (Tr. 671.) He encouraged Plaintiff to continue to use a walker, "especially for longer distances outside of the home" and he gave her a prescription for her own walker. (Tr. 671.) He also recommended new flexible ankle-foot orthoses and new night splints, noting that she had used them in the past, they were old and no longer fit her, and that the last time she used night splints, they caused bruising on her ankles. (Tr. 671.)

A note from May 2007 shows Plaintiff was referred to physical medicine and rehabilitation for pain and "gait/falls." (Tr. 678.) It was not until the May 2007 treatment notes that her gait and falls were again noted: "In addition, she is having some trouble with her gait and having frequent falls. She was working with Physical Medicine and Rehab regarding this." (Tr. 677.)

The ALJ also cited the consultative examinations that took place in October 2006, months prior to Dr. Eckner's and Dr. Wardner's first examinations and treatment. (Tr. 36.) Plaintiff

underwent a consultative physical exam with Leonidas Rojas, M.D., on October 10, 2006. (Tr. 609-610.) Dr. Rojas noted Plaintiff's report that she had undergone a series of corrective surgeries on her lower limbs, and that her "gait has improved considerably but she claims that she still falls at times. She uses a walker quite often but today she came without any walking aid. In general she walks mostly indoors. She still has muscle spasm in her legs on and off." (Tr. 609.) He noted Plaintiff's report that she "manages to do more of her housekeeping except for the heavier chores," she "is able to take care of her personal needs," and she "drives only short distances." (Tr. 609.) On examination, Dr. Rojas reported that Plaintiff had "some difficulty standing up from a chair or getting on or off the examining table." (Tr. 610.) The doctor reported that her grip strength was 5/5 and she was able to perform fine and gross manipulation. (*Id.*) He noted surgical scars on the lower extremities, right calf circumference at 12 inches and left calf circumference at 11 ½ inches. (*Id.*) Range of motion in both knees was 0-120 degrees, she was unable to squat, and her ankle joints had moderate restriction on flexion and dorsiflexion. (*Id.*) The doctor reported that Plaintiff's "gait is unsteady but she manages to walk without assisting devices," there was no sensory deficit, muscle tone was increased in both legs, there were no tremors and thought content and association were grossly normal. (*Id.*) He diagnosed a history of asthma with intermittent exacerbations, a history of cerebral palsy involving both lower limbs, obesity and mild hypertension. (*Id.*)

Muhammad Ahmed, M.D., completed a Physical Residual Functional Capacity Assessment dated November 13, 2006. (Tr. 616-24.) Dr. Ahmed is a medical evaluator who had the benefit of Dr. Rojas's examination report. (Tr. 618.) Dr. Ahmed opined that Plaintiff had primary diagnoses of cerebral palsy with late effects of surgeries, secondary diagnoses of asthma and mild hypertension and had obesity. (Tr. 617.) Dr. Ahmed opined that Plaintiff could occasionally lift

and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk at least two hours and up to four hours unaided, of an eight-hour workday, sit approximately six hours of an eight-hour workday, was limited in all postural activities to no more than occasionally, and had no manipulative, visual or communicative limitations. (Tr. 618-21.) He opined that she should have no more than occasional exposure to fumes, odors, dusts, gases, and poor ventilation and hazards such as machinery and heights. (Tr. 621.)

The ALJ also considered a consultative mental examination by psychiatrist Ibrahim Youssef, M.D., on October 10, 2006. (Tr. 611-13.) Dr. Youssef diagnosed dysthymic disorder and major depression, recurrent, currently mild to moderate. (Tr. 613.) The doctor noted Plaintiff's reports that she had depressive symptoms on and off since age 8, she had a history of counseling and treatment, and had not seen a psychiatrist since 2000. (Tr. 611.) She had taken antidepressants in the past, prescribed by her own family doctor or a clinic, yet she stopped the medications when she was pregnant. (*Id.*) Here, too, is evidence of Plaintiff's report that her functional limitations were increasing. The doctor noted Plaintiff's report that she had worked in the past, but "found it increasingly more difficult as with age and he (sic) disability worsened especially the pain and the spasticity in the lower extremities. She said he (sic) no longer was able to walk without falling." (Tr. 612.) Plaintiff reported that she cares for her children, preparing lunch for them and washing their hands, yet her husband bathes them. (*Id.*) She reported that she "is no longer able to take them out as she cannot run after them." (*Id.*) The doctor observed that Plaintiff "looked like she was dragging her legs when she walked with very significant difficulty in that area." (*Id.*) She was reportedly able to "remember and attend her appointments." (*Id.*) The doctor noted Plaintiff's report that her husband had been laid off recently, was having difficulty finding a job and had been helping her at home. (Tr. 612.)

19

2:13-cv-11998-MFL-CEB   Doc # 15   Filed 12/09/14   Pg 20 of 22   Pg ID 953

Daniel Blake, Ph.D., a medical evaluator, completed a Psychiatric Review Technique dated November 16, 2006. (Tr. 625-43.) Dr. Blake diagnosed dysthymic disorder and major depression, mild to moderate. (Tr. 629.) He opined that Plaintiff had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace, and no episodes of decompensation of extended duration. (Tr. 636.) Dr. Blake concluded that Plaintiff's cognitive skills were adequately maintained, her activities of daily living were not markedly restricted and she retained mental functioning "sufficient for sustained work activity." (Tr. 642.)

"In the case at bar, while we recognize the presence of some conflicting evidence in the record, we nevertheless find substantial evidence to support the Secretary's determination that appellant failed to establish disability prior to the expiration of his insured status." *Siterlet*, 823 F.2d at 920. The ALJ gave good reasons for declining to give Dr. Wardner and Dr. Eckner controlling weight and he cited contradictory evidence in the record. The ALJ cited records, examination notes and Plaintiff's reports from the period at issue that directly contradict an assertion that there would have been no progressive change in Plaintiff's extremities and resultant limitations. (Tr. 35.)

The ALJ did not err in giving more weight to those doctors and that evidence closer to the time period at issue. The notes for treatment received between the alleged onset date and October 2006, do not suggested the level of impairment of which Plaintiff began to complain in October and December 2006. The ALJ relied on substantial evidence in the record to conclude that "[w]hatever the reason for the appearance of symptoms such as increased falling and decreased ability to ambulate independently, the record does not reflect such occurrences with nay (sic) regularity until after the previously established onset date. During the timeframe at issue, the

20

record does not adequately support such occurrences." (Tr. 35.) Despite Plaintiff seeking medical treatment for asthma and sinus-related complaints during these years, she was not seeking treatment for cerebral palsy-related symptoms.

As Defendant points out, an assertion that the ALJ found that Plaintiff was "suddenly" disabled on a date certain, October 20, 2006, over-simplifies and ignores the actual evidence on which the ALJ based his findings. (Doc. 11 at 23.) The ALJ cited evidence to support his finding that Plaintiff was severely limited prior to that time, yet remained able to complete a limited range of sedentary work. While medical evidence for the period at issue is scant, the few medical records available include doctor's examinations and observations that support a finding that Plaintiff could perform a limited range of sedentary work prior to October 10, 2006. The selection of the October 10, 2006 date has a basis in the examinations and observations of physicians on that date who concluded Plaintiff could perform work, yet it coincides with Plaintiff beginning to seek medical treatment in October and December for increasing complaints of falls and increased lower-extremity limitations, which were simply not present in the record to contradict the ALJ's RFC prior to that date.

The ALJ's RFC was supported by substantial evidence, including the opinions of examining and consultative examiners Dr. Rojas, Dr. Ahmed, Dr. Youssef and Dr. Blake. (Tr. 609-10, 611-13, 612-24, 625-43.) In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record and the ALJ did so. *See Casey v. Sec'y of Health and Human Serv.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The VE's testimony is substantial evidence supporting the ALJ's finding that Plaintiff could perform a substantial number of jobs in the economy prior to October 10, 2006. The ALJ's findings at step five are supported by substantial evidence.

21

**G.      Conclusion**

The ALJ's decision to deny benefits was within the range of discretion allowed by law, it is supported by substantial evidence and there is simply insufficient evidence to find otherwise. Defendant's Motion for Summary Judgment (doc. 11) should be granted, that of Plaintiff (doc. 10) denied and the decision of the Commissioner affirmed.

**III.   <u>REVIEW</u>**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985);  *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006)(*citing Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987)). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  E.D. Mich. LR 72.1(d)(3). The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ Charles E Binder

CHARLES E. BINDER
United States Magistrate Judge

Dated: December 9, 2014

22